440 So.2d 88 (1983)
STATE of Louisiana
v.
Marilyn Jean DYKES and James Douglas Smith.
No. 82-KA-1656.
Supreme Court of Louisiana.
October 17, 1983.
William J. Guste, Jr., Atty. Gen., Barbara Rutledge, Asst. Atty. Gen., James L. Davis, Dist. Atty., Abbott Reeves, Asst. Dist. Atty., for plaintiff-appellee.
Ted Brett Brunson, Lowther & Boone, for defendants-appellants.
WATSON, Justice.[*]
Defendants, Marilyn Jean Dykes and James Douglas Smith, were tried jointly for cruelty to juveniles in violation of LSA-R.S. 14:93.[1] Defendants were convicted of the charge by a unanimous six person jury and both were sentenced to four years at hard labor. Defendants have appealed their convictions and sentences.

FACTS
Christopher Dykes, age three at the time of trial on February 16 and 17, 1982, is in *89 the legal custody of his father. Christopher was born March 28, 1978, and had his fourth birthday the month after trial.
Between June 1 and June 14 of 1981, Christopher was staying with his mother, Marilyn Dykes. At that time, Marilyn was living with James Douglas Smith. Christopher's father, Dale Dykes, picked up his son on June 14 and described him as dirty and unwashed, with his clothes "full of diarrhea" (Tr. 115). According to the father, Christopher complained about some sores. While having his bath, the child said "James" had burned him with a cigarette lighter (Tr. 116). On the following morning, a Monday, Dale Dykes' mother and sister-in-law took the child to Dr. Sandifer.
Dr. Don L. Sandifer, a physician in family practice, testified that he had seen Christopher on December 18 and 19, 1979, and again on June 15, 1981. The child's complaints on the last visit were diarrhea and skin lesions on the body. Dr. Sandifer did not recall any complaint of child abuse. His records describe the child as having diarrhea and infected skin lesions of unknown etiology, which could have resulted from impetigo, insect bites, burns, ringworm, abrasions or dermatitis. In his practice, Dr. Sandifer sees a lot of accidental burns.
On June 16, Christopher was taken to the DeSoto General Hospital emergency room, where the physician on duty noted that the lesions appeared to be "a few days old". (S-5) Christopher's family physician is shown on the report as Dr. Bucy.
Subsequently, Dr. Roy S. Bucy saw Christopher on June 17. Dr. Bucy testified that he is a general surgeon trained in burn therapy. When he saw Christopher, the boy was accompanied by his father and a deputy sheriff. There was a perfectly circular lesion on each leg, one on the right knee and one on the left thigh. They could have been inflicted with a cigarette or car type lighter but might have resulted from other causes. Dr. Bucy believed another circular lesion in the inguinal or groin area (S-2) was definitely a burn, a second degree injury. The injuries were a week to ten days old. The lesion on the groin was not as well healed as the others. Dr. Sandifer said he would not disagree with Dr. Bucy's diagnosis of the lesion in the groin area as a second degree burn.
During the period from June 1 to June 14, Dale Dykes had had his wife and her paramour under observation in order to obtain grounds for a divorce. He admitted that he had never known his wife to physically harm their son. There has been no visitation between Christopher and his mother since June of 1981.
After an examination in chambers, which is unavailable for review,[2] the trial court concluded that Christopher was a competent witness. LSA-R.S. 15:469.[3]
At trial, Christopher indicated he knew the difference between the truth and a lie and was telling the truth, but did not explain the difference.[4]
Christopher testified that "James burned me" (Tr. 132). Although Christopher initially *90 refused to point out James Smith in the courtroom, he later did so. He testified contradictorily when asked if anyone was with James when the burn was inflicted, saying yes, and then no. Christopher said he had been burned by a cigarette lighter and identified a Bic lighter as being like the one that was used.[5] According to the child, the knee sore resulted from a fall off a tricycle. "James" was pushing him on the tricycle when he fell and injured his knee. (Tr. 135). Asked to identify James, Christopher again pointed to James Smith. Christopher indicated that James had burned him on the leg, the toe and both hands.[6] Christopher had had mosquito bites while he stayed with his mother which he had scratched until they turned into sores.
According to Christopher, his father had told him that James burned him. Christopher indicated that he had been told what to say at trial by the prosecuting assistant district attorney and his daddy.[7]
A neighbor of Marilyn Dykes, Linda Price, testified that she saw Christopher every day during the two weeks he stayed with his mother because Christopher and her five year old daughter were inseparable; played together from morning until bedtime; and often spent the night together. She has four children; one, an eighteen year old, does not live with her. According to Ms. Price, Christopher was well cared for and bathed daily. Christopher did have some insect bites and also a concrete burn where he had scraped his knee when he fell off a tricycle. Her daughter Amy was with him at the time and also got a scrape. She identified exhibits S-1 and S-3 as showing the infected insect bites and S-4 the knee sore. Marilyn had treated the bites with Calomine lotion. Ms. Price was unfamiliar with the lesion in the groin area, but said that Christopher was a happy child and had not complained to her during the two weeks that he was a constant companion of her daughter. Ms. Price had never seen Marilyn do anything to harm Christopher and had never seen James Smith mistreat the child. Her own children all loved James Smith.
Linda Price's son, James Crawford, said that he saw Christopher every day during the two weeks the boy was with his mother. James Crawford does not live with his mother and was visiting her and his sisters during the summer. He was pushing Christopher on a tricycle one day when Christopher skinned his right knee and elbow. The only complaints Christopher ever made were about the scrapes he received in the tricycle fall. James Crawford rode in the van with Marilyn Dykes when she returned Christopher to his father. Marilyn changed Christopher's clothes just before they met his father. Christopher cried about having to leave his mother and initially refused to get in the car with his father. Dale Dykes was quoted as telling Marilyn that she was not going to see the child any more before he and Christopher drove off.[8] Crawford confirmed that Christopher had had diarrhea during the visit with his mother.[9]
*91 Mark A. Campbell, who knows Marilyn Dykes only slightly, saw her meet her former husband to transfer Christopher; the child seemed happy; and his mother changed his clothes in the van just before the father arrived.
Benita Smith, the reconciled wife of James Smith, testified that the couple has four children, ranging in age from five years to nine months. To her knowledge, James has never mistreated his children or any others. James was with her visiting the children when the warrant for his arrest was served. According to Benita Smith, Dale Dykes drove up shortly afterward and said: "he had told him he would get even with him."[10] (Tr. 169)
Marilyn Dykes testified that she had never seen the sore in the groin area depicted in Exhibit 2, and Christopher did not have a sore that large during his stay with her. She had seen the sore on the child's knee and testified that the child had had mosquito bites. She had treated his diarrhea with a doctor's prescription. According to Marilyn, James only stayed at her apartment a few weeks. During that time, he treated Christopher well and the two had a good relationship. When her husband picked up Christopher he said, "I will see to it that you never see the baby again." (Tr. 176) She confirmed that Christopher cried about leaving her.
James C. Smith testified that he has been working for the same employer for three years. He had a felony conviction for burglary in 1975, pled guilty, served his probationary period successfully, and was pardoned. He works six days a week at his job and was at Marilyn's house during the day only on Sundays. He denied having burned or hurt Christopher and testified that he had never seen the sore on the groin.
Ms. Carla Caston testified in rebuttal that Christopher was not closely supervised by his mother.

ISSUE
The question is whether the testimony of three year old Christopher Dykes and the other circumstances were sufficient to prove defendant's guilt.[11]

CONCLUSION
Since Dr. Bucy said that the second degree burn on the groin was at least a week old, the injury apparently occurred while Christopher was in the care of his mother.[12] However, the only other evidence linking these defendants to that injury is that of Christopher Dykes.
At the time of the alleged offense, Christopher Dykes was approximately three years, two and a half months old. At the time of trial he was three years, ten and a half months old. The youngest child ever found competent to testify in Louisiana was four years old. State v. Arnaud, 412 So.2d 1013 (La., 1982). In Arnaud, the child's testimony is much more positive and convincing than that elicited from Christopher Dykes.[13] "[N]ature does not always impart the same maturity ... at the same age." LSA-C.C. art. 34.[14] The child's testimony was not the sole evidence in Arnaud. In State v. Noble, 342 So.2d 170 (La., 1977), a four year old victim testified at the age of five about her rape. However, the child's responses in that case "demonstrated understanding and intelligence". 342 So.2d at 172. The child's physical condition and *92 the circumstantial evidence strongly corroborated her testimony.
Courts are lenient in allowing the testimony of very young witnesses in child abuse cases because, quite often, no other evidence is available. However, children of three years or less are not generally competent witnesses. See Oliva v. Baum, 194 So.2d 319 (Dist.Ct.App.Fla., 1967); Moser v. Moser, 82 S.D. 149, 143 N.W.2d 369 (1966); People v. Willson, 401 Ill. 68, 81 N.E.2d 485 (1948). In Love v. State, 64 Wis.2d 432, 219 N.W.2d 294 (1974), a three year old testified, but there was no contemporaneous objection. The court stated that the child's testimony alone would not have sustained a conviction. In Kelluem v. State, 396 A.2d 166 (Del., 1978), a three year old child who was molested by a babysitter testified at trial when he was four years, five months old. Defendant was convicted of attempted sodomy in a bench trial solely on the basis of that testimony. In Kelluem, there was expert testimony about the child's capacity, and his own testimony established that he understood the meaning and necessity of telling the truth. The time interval between the crime and the trial was only five months.[15]
There are some cases of testimony by four year old children. See Miller v. State, 391 So.2d 1102 (Ala.Cr.App.1980); People v. Edgar, 113 Mich.App. 528, 317 N.W.2d 675 (1982); Fields v. State, 500 S.W.2d 500 (Tex.Cr.App.1973); State v. Thrasher, 233 Kan. 1016, 666 P.2d 722 (1983); State v. Tuffree, 35 Wash.App. 243, 666 P.2d 912 (1983); Hill v. Skinner, 81 Ohio App. 375, 79 N.E.2d 787 (1947); Jackson v. State, 239 Ala. 38, 193 So. 417 (1940); In re Lewis, 88 A.2d 582 (D.C., 1952); State in Interest of R.R., 398 A.2d 76, 79 N.J. 97 (1979); State v. Olson, 113 Wis.2d 249, 335 N.W.2d 433 (1983); State v. Beeks, 311 N.W.2d 496 (Minn., 1981). In Olson and Beeks there was no objection to the competency of the child witnesses. "[A]t the age of 5 the utmost limit would be ordinarily reached, unless extraordinary development of the mental and religious faculties should be shown, to take the case out of the ordinary course of nature." State v. Michael, 37 W.Va. 565, 16 S.E. 803 (1893). See State v. Jones, 360 Mo. 723, 230 S.W.2d 678 (1950).
The colloquy here between the trial judge and Christopher Dykes, which determined his competency as a witness, is not available. This transcript concerns the crucial issue at trial, the credibility and competency of Christopher as a witness.[16] While the conclusion of our esteemed colleague of the trial court commands our respect, his decision must be reviewed on appeal, and due to the lack of a transcript of the examination in Chambers, Christopher's competence must be considered only on the basis of his trial testimony.
The transcript does not establish that Christopher understood the meaning and importance of telling the truth. Christopher identified defendant James Smith as the one who had pushed him on the tricycle when he hurt his knee, but this testimony was directly contradicted by the testimony of James Crawford. Crawford saw Christopher only during a summer visit with his mother, and appears to be a completely credible and disinterested witness.
Christopher was extremely reluctant to identify James Smith in the courtroom. It is entirely possible that James Smith and James Crawford were confused in the child's mind. During his stay with his mother, he saw more of James Crawford, who was there daily, than he did James Smith, who worked every day except Sunday.
Christopher identified the assistant district attorney and his father as the people who had told him what to say at trial. The state made no attempt to rehabilitate Christopher as a witness. Very young children "repeat with phonographic precision the things that have been told them to say, be they true or false. Neither reason nor authority *93 justifies the admission of such witnesses...." State v. Michael, supra, 16 S.E. at 804.
Although Christopher probably received a second degree burn while staying with his mother and her paramour, it is clear from the evidence that he was continuously with his five year old playmate, her sisters, and her older brother. The injury could have occurred accidentally. The child's testimony alone cannot support the convictions. Love v. State, supra. On the record presented, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could not have found beyond a reasonable doubt that defendants were guilty of the crime of cruelty to juveniles. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Every reasonable hypothesis of innocence was not excluded. LSA-R.S. 15:438.[17]
For the foregoing reasons, the convictions and sentences of defendants are reversed and vacated. It is ordered that defendants be discharged.
REVERSED; SENTENCES VACATED; DEFENDANTS DISCHARGED.
NOTES
[*] Bailes, J. sitting for Justice Marcus.
[1] LSA-R.S. 14:93 provides:

"Cruelty to juveniles is the intentional or criminally negligent mistreatment or neglect, by anyone over the age of seventeen, of any child under the age of seventeen whereby unjustifiable pain or suffering is caused to said child. Lack of knowledge of the child's age shall not be a defense.
"Whoever commits the crime of cruelty to juveniles shall be fined not more than one thousand dollars, or imprisoned for not more than ten years, with or without hard labor, or both."
[2] "I can only assume that, through error, this tape was erased upon completion of the transcript of the trial. * * * Joann S. Wright, Court Reporter."
[3] LSA-R.S. 15:469 provides:

"Understanding, and not age, must determine whether any person tendered as a witness shall be sworn; but no child less than twelve years of age shall, over the objection either of the district attorney or of the defendant, be sworn as a witness, until the court is satisfied, after examination, that such child has sufficient understanding to be a witness."
[4] "Q. Chris?

"A. What.
"Q. You know what you are here for, you are going to tell the truth, aren't you?
"A. Yes." (Tr. 130)
* * * * * *
"Q. Chris, do you know the difference between the truth and a lie?
"A. Uh huh. (Yes)
"Q. Are you telling the truth today?
"A. Uh huh. (Yes)
"Q. Are you telling the truth when you say that James burned you?
"A. Uh huh. (Yes)
"Q. Is it bad to tell a lie?
"A. Uh huh. (Yes)
"Q. Do you get in trouble when you tell lies?
"A. Uh huh. (Yes)" (Tr. 137-138)
[5] Such a lighter would probably not have produced a perfectly circular lesion.
[6] There were no sores on the toe or hands.
[7] "Q. Chris, tell me something, did anybody tell you what to say?

"A. Uh huh. (Yes)
"Q. Who?
"A. (Pointed to Mr. Herman Lawson)
"Q. When did he tell you what to say, it wasn't when I was with you yesterday day, (sic) was it?
"A. (Looking at the widow and didn't answer)
"Q. Are they still there?
"A. Uh huh. (Yes)
"Q. Turn around here now. Did your Daddy tell you what to say?
"A. Uh huh. (Yes)
"Q. He did?
"A. Uh huh. (Yes)
"Q. Did he tell you that James burned you?
"A. Uh huh. (Yes)
"Q. Did he tell you that a long time ago?
"A. Uh huh. (Yes)
"Q. Did he tell you that today too?
"A. Uh huh. (Yes)" (Tr. 136-137)
[8] Dykes testified that this was because she was living with James Smith.
[9] James Crawford is apparently much older than Christopher and his little sister. He carried Christopher up to his mother after the tricycle accident. He may be the eighteen year old referred to in his mother's testimony.
[10] Dykes denied going to the Smith home and conversing with Benita Smith.
[11] Assignment of Error Number One. The other assignments are pretermitted.
[12] The emergency room report indicates, to the contrary, that the injury was only a few days old.
[13] Footnote 2 of the opinion; 412 So.2d 1018.
[14] LSA-C.C. art. 34 provides:

"Age forms a distinction between those who have, and those who have not sufficient reason and experience to govern themselves and to be masters of their own conduct. But as nature does not always impart the same maturity and strength of judgment at the same age, the law determines the period at which persons are sufficiently advanced in life to be capable of contracting marriage, and forming other engagements."
[15] Here, the time interval was slightly over eight months.
[16] The Louisiana Constitution requires a "complete record of all the evidence upon which the judgment is based", LSA-Const. 1974 Art. 1, § 19.
[17] LSA-R.S. 15:438 provides:

"The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence."