I rPLOTKIN, Judge,
Dissenting.
I agree that the record is sufficient to address appellant’s claim on appeal that he received ineffective assistance of counsel at trial. I also agree that appellant’s counsel at trial was not ineffective for opting not to make an opening statement. I respectfully disagree, however, with the majority’s finding that defense counsel was not ineffective despite failing to object to hearsay, and even strategically eliciting hearsay.
At trial, Detective Sanders attempted to testify that the victim’s mother told him that appellant was her child’s caretaker on the evening she was injured. Defense counsel objected and the objection was sustained. Detective Sanders then succeeded in describing the appellant as “the baby’s caretaker that evening” without further objection by the defense. Detective Sanders testified that the victim’s mother identified the appellant as the caretaker who had injured her child. On cross and rebuttal, both the State and defense counsel questioned Detective Sanders further about the statements made by the victim’s mother implicating the appellant. This hearsay was the only evidence presented at trial which placed the appellant at the scene of the crime or from which it could be inferred that appellant was the perpetrator of the crime.
Failure to object to obvious hearsay has been characterized by the Louisiana Supreme Court as “a textbook unprofessional error.” State v. Sanders, 93-0001, p. 27 (La. 11/30/94), 648 So.2d 1272, 1292. In State v. Soler, 636 So.2d 1069, 1079 (La.App. 5th Cir.1994), writ denied, 94-0475 (La. 4/4/94), 637 So.2d 450 and 94-1361 (La. 11/4/94), 644 So.2d 1055, defense counsel deliberately elicited hearsay testimony that conflicted with the victim’s own account. Unlike the strategy in Soler, it is difficult to conceive, as the majority does, of a defense strategy that would tolerate the introduction of inadmissible hearsay which is the only evidence to place the appellant at the scene of the crime. This hearsay which was used to prove that appellant was the perpetrator was not cumulative of other evidence, as in In re D. McK., 589 So.2d 1139 (La.App. 5th Cir.1991) and State v. Arvie, 482 So.2d 1083 (La.App. 3d Cir.1986). Unlike in State v. Ratcliff, 416 So.2d 528 (La.1982), defense counsel did not initially open the door to this testimony. Defense counsel’s error in permitting the jury to hear the only testimony that suggested appellant was the perpetrator of the crime was so serious that I find he was not functioning as the “counsel” mandated by the Sixth Amendment.
In State v. Spears, 94-0327, p. 6-7 (La.App. 4th Cir. 12/15/94), 647 So.2d 1313, 1316-17, writ denied, 95-0136 (La. 5/19/95), 654 So.2d 1353, this Court found that an officer’s account of a Crime Stoppers identification was not used to prove that the defendant was the perpetrator. This Court noted, moreover, that identification was not a serious issue in Spears. Id. at p. 7, 1316. Unlike the testimony in Spears, Detective Sanders’s *587 testimony was used as a passkey to place improper and damaging hearsay before the jury, who would otherwise never have been told by any competent witness that the appellant injured the child or was even present at the scene of the offense. See State v. Hearold, 603 So.2d 731, 738 (La.1992). Given this lack of evidence, I conclude that there was a reasonable probability that a different outcome would have been reached without hearsay, and I find defense counsel’s errors so serious as to have deprived appellant of a fair trial.
IsAt trial, moreover, the victim’s four-year-old sister Jennifer testified as follows:
Q Jennifer, do you remember when your sister Shelita got hurt?
A Yeah.
Q And what happened to your sister, Shelita’s feet?
A Got burned.
Q Could you speak into here? What happened to them?
A They got burned.
Q And who burned her feet?
A Sammy.
Q Do you see Sammy in court, here, today? Is that Sammy, there?
The Court: Let’s don’t exclude everybody in the courtroom.
A No.
Mr. Collins: Your honor, she can’t see him all the way over there.
The Court: Let her get down and go walk around if she needs to.
Q Jennifer, would you come with me, please? I’m going to walk you past people in court. When you see Sammy, I’d like you to say something. Walk around and see everybody in court and tell me if you see Sammy. Come on, you got to walk around. Do you see Sammy? Jennifer, do you see Sammy?
A (Shakes head in a negative manner)
The Court: You’ve got to stop her from doing that. It’s some kind of affliction she has with rubbing her eyes.
Q I want to show you everyone. Jennifer, have you looked at this man? Have you looked at this man? Who is that man? Is that Sammy?
A (Shrugs shoulders)
Q You don’t remember?
A (Shakes head in a negative manner)
Q Jennifer, I’m going to ask you a few more questions. Where was Sammy living when this happened?
A (Shrugs shoulders)
Q Answer into the microphone.
A (Shrugs shoulders)
Q Jennifer, take your hand out of your mouth, put your hand there. Tell me— take your hand out of your eyes, please. Where was Sammy living when this happened? Was Sammy living with you and your sisters?
A (Shrugs shoulders)
Q Jennifer, do you remember when your sister’s feet got burned?
A I don’t know.
[[Image here]]
Q Jennifer. Jennifer, look at me. Do you remember your sister, Shelita?
A A picture of her over there.
Q Yes. And do you remember what happened to her? What happened to her? A She got burnt.
|4Q, Speak up a little bit.
A Feet got burnt.
Q And who burnt her feet?
A Sammy.
Q Speak up a little bit.
A Sammy.
Q And was Sammy living with you all at that time?
A (Shrugs shoulders)
Q Did you see Sammy bum your sister’s feet? Jennifer, did you see Sammy bum your sister’s feet?
A (Nods head in an affirmative manner)
Q Could you say that into the microphone?
A Yeah.
Q And what did he bum her feet with? A Hot water.
Q Could you speak a little louder into here?
*588 A Hot water.
Q And where did he burn her feet? Where was the hot water?
A In the tub.
Q And did he do anything else to her?
A (Shrugs shoulders)
Q You just saw — did you see him bum her feet with the water? She’s freezing up. No further questions at this time.
Unlike testimony from children Jennifer’s age that has been accepted in the past in Louisiana courts, Jennifer’s testimony neither demonstrated the requisite understanding and intelligence, as in State v. Noble, 342 So.2d 170, 172 (La.1977), nor did circumstantial evidence strongly corroborate her testimony, as in State v. Dykes, 440 So.2d 88, 91 (La.1983), nor did Jennifer testify without equivocation, as in State v. Garay, 453 So.2d 1003, 1009 (La.App. 4th Cir.1984) (Schott, J., concurring). See also State v. Stukes, 552 So.2d 493, 498 (La.App. 4th Cir.1989). Assuming arguendo that the trial judge did not abuse his discretion in qualifying Jennifer to testify, it is difficult to imagine that defense counsel sat strategically silent during her testimony.
Defense counsel did not object when the State offered to walk Jennifer over to the defendant to identify him. Defense counsel did not object when the State repeatedly tried to force Jennifer to identify the defendant despite her obvious reluctance or inability to do so. Defense counsel did not object when the State exceeded the latitude it must be given in questioning a child witness. Defense |scounseI did not request any special instructions to aid the jury in evaluating her testimony. Cf. State v. Ford, 489 So.2d 1250, 1267 (La.1986), vacated on other grounds, 479 U.S. 1077, 107 S.Ct. 1272, 94 L.Ed.2d 133 (1987). In closing, defense counsel only cursorily argued that Jennifer had been coached by the State to testify.
I find that the cumulative effect of defense counsel’s ineffectual handling of the testimony of the child witness and the detective’s hearsay was to deny the appellant his Sixth Amendment right to assistance of counsel. Accordingly, I would remand the case for a new trial with a new defense counsel.
SCHOTT, C.J., concurs.
PLOTKIN, J., dissents.