(132 So. 127)

**CORBELLO** et al. v. **CORBELLO.**

No. 30757.

Dec. 1, 1930.

Rehearing Denied Jan. 5, 1931.

Thomas Arthur Edwards, of Lake Charles, for appellants.

Cline, Plauche & Girod, of Lake Charles, for appellee.

O'NIELL, C. J.

Mrs. Erisse Corbello, who resided in the parish of Calcasieu, and was very old, senile, and poverty stricken, suddenly came into possession of valuable oil property in Orange county, Tex., in 1924. She was interdicted because of her senile dementia, in March, 1925, and the Calcasieu National Bank of Southwest Louisiana was appointed curator of the interdict. The bank rendered a provisional account of the curatorship every year, and these annual accounts were regularly verified and approved by the district judge, until the old lady died, on the 3d of February, 1930, when the bank rendered its final account. Thereupon this suit arose by way of opposition, on the part of the heirs of the deceased, to the approval of the bank's accounts. The district court gave judgment approving the final account, except that the court ordered the bank to amend the account by giving the estate of the deceased credit for interest at 5 per cent. per annum on uninvested sums in excess of $500, which interest amounted to $72.-50. The heirs of the deceased have appealed from the decision; and the bank, answering the appeal, prays that the judgment be amended so as to relieve the bank of the charge of $72.50 interest, and that the account be approved as rendered.

The complaints of the appellants are, for the most part, merely general and very drastic accusations of extravagance and maladministration on the part of the trust officer of the bank, who attended personally to the affairs of the interdict. The evidence, on the contrary, shows that the services were rendered faithfully and with due regard for conserving the estate of the interdict.

The first specific complaint of the appellants is their allegation that the provisional accounts rendered annually by the curator, as well as the final account, were not proven according to law, or contradictorily against the undercurator, and should be proven anew. In every instance a notice of the filing of the account was published according to law; the undercurator acknowledged that he had received due notice of the filing of every provisional account, and had examined the accounts and found them to be correct. He and the attorney appointed to represent the absent heirs, and the attorney then representing the present appellants, accepted service of a copy of the final account, both before and after an amendment thereto was made at the request of the bank. Every judgment of approval of the accounts contained a recital that due notice of the filing of the account had been given, and that all of the requirements of the law had been observed. We do not find any omission or defect in the proceedings in that respect.

The next complaint is the allegation that the expenditures made by the curator, without the advice of a family meeting, exceeded the revenues of the interdict, to the extent of $600 on the second provisional account, $2,595.-61 on the third provisional account, and $1,-136.89 on the final account. The record, however, does not show that the expenditures for account of the interdict exceeded her revenues. When the bank was appointed curator it re-

ceived $3,500 from the guardian in Texas, as the entire amount of capital belonging to the interdict. All sums received thereafter were for royalties, which were paid monthly to the bank, and bonuses, which were paid at longer intervals, on the oil leases in Orange county, Tex. The royalties and bonuses were treated as revenues, and there seems to be no complaint of their having been so regarded. Soon after the bank received the $3,500, the bank was authorized by the court to buy, and did buy, a home for the interdict, costing $2,-500. That left only $1,000 of the original capital to be accounted for by the curator. At the termination of the curatorship, by the death of the interdict, she had a cash balance of $5,243.04 in bank, subject to charges amounting to only $828.70, or $4,414.34 net, besides the residence in Calcasieu parish, La., and the oil properties in Orange county, Tex. During the term of the curatorship, the bank was authorized by the court to pay, and did pay, from time to time, small sums of money to some of the appellants, who were in indigent circumstances. Those disbursements amounted to $820, and are not complained of. The total sum of the royalties and bonuses received by the bank for account of the interdict was $24,388, and the total expenditures, including the cost of the home and the sums advanced to some of the appellants, amounted to $22,645.95,—or $1,742.05 less than the revenues.

▪ The next complaint has reference to the home which was bought for the interdict and afterwards repaired at her expense. It is charged that the property cost originally $1,-100 more than it was worth, and that the repairs cost $683.71 more than the curator was authorized to spend for repairing the property. The appellants ask that the curator be charged $4,800, as the cost of buying and repairing the property, or, in the alternative,

that the curator be ordered to pay the $1,100 excess cost of the property and $683.71 excess cost of the repairs. The evidence does not sustain the allegation that the property was not worth what it cost originally—$2,500. It is true that there was no family meeting called to advise upon buying the home for the interdict, but that formality was dispensed with under the conditions prescribed by Act No. 110 of 1920, p. 159; and the law in that respect was complied with literally. It is true also that the curator asked for and obtained the authority of the judge to spend only $1,600 for repairing the property, and that the repairs, when completed, cost $2,283.71, or $683.-71 more than the amount authorized. In the total sum of $2,283.71 appearing on the account as the cost of repairing the property, however, are several items, amounting to $226.54, being $29 for surveying, $36.90 for digging a well, $49 for plowing and grading, and $111.64 for insurance premiums; which items do not belong in the list of repairs. The cost of the repairs, therefore, exceeded the amount authorized by only $437.17; and the reason for this excess is well explained by the testimony to the effect that, as the repairing progressed, it was found that the property was more in need of repairs than the curator estimated when he asked for authority to make the repairs. An itemized account of the actual cost of the repairs was submitted in the next annual or provisional account of the curator, was proven to be correct, and was approved by the decree of the court. We do not find any cause for complaint in that respect.

The next complaint in the lower court was that the curator had computed his commission of 10 per cent. upon the original capital, $3,-500, as well as upon the revenues received for account of the interdict. The curator conceded in the lower court that the complaint

was well founded, and promptly amended the account by giving the estate credit for $350 of the commission, before the opposition came to trial.

■ The next complaint is that the following items of expenditure were, as the appellants contend, unnecessary, unauthorized, and unlawful, viz.: $160 for a secondhand Ford car; $150 for a cow; $60 paid in exchanging the cow for another cow; $78 for a sewing machine; and $54.20 for chickens. We do not find that there was extravagance in any of these expenditures. Considering that the old lady's income averaged $413.35 a month, she was entitled to ride about in something even better perhaps than a secondhand Ford car; and the cost—$160—does not seem to be out of line. As to the cows, it does seem, prima facie, to have been a bad business transaction to pay $150 for a milch cow, and soon afterwards trade her and $60 besides for another cow. But the explanation is satisfactory. The first cow, which was a high-grade Jersey, worth $150, suffered a physical ailment which consigned her to the slaughter house, and hence was profitably given in trade, with the additional $60, for another cow. The sewing machine was also a good investment, for making and mending the old lady's wearing apparel; and so was the flock of chickens a good investment for the interdict got much pleasure and some profit out of the occupation of raising chickens and selling eggs.

■ The next complaint has reference to the salaries paid to servants who attended to the personal wants of the interdict. It is contended that these servants should have been regarded as curators of the person of the interdict, and should have received, or should have been paid out of, half of the commission of 10 per cent. allowed the bank as curator of the property of the interdict. The sixth sub-section of section 1 of Act No. 45 of 1902, p. 59, providing for the appointment of a bank and trust company as tutor, curator, etc., declares that, whenever a bank and trust company shall have been appointed tutor of a minor or curator of an interdict, the bank shall have the care, custody, and administration of the property of the minor or interdict; that the care of the person of the minor or interdict shall be confided to the person who would be otherwise entitled by law to the tutorship of the minor or curatorship of the interdict; and that, in such case, the commissions allowed by law shall be divided equally between the bank and the person having the custody of the person of the minor or interdict. In this case the care and custody of the person of the interdict was not confided to any person. Such a curator was appointed, but he did not accept the trust or serve as curator of the person of the interdict, and no one was appointed in his stead. There was therefore no one to claim half of the bank's commission as curator. The trust officer of the bank attended to all of the personal affairs of the interdict, for which no charge has been made in addition to the commission which the law allows the curator. The salaries paid to the servants who waited upon the interdict amounted to only $1,209.10—less than $25 per month—during the whole period of interdiction. These servants were not curators, in the meaning of the act of 1902. There is no error in the curator's account in that respect.

■ The next complaint of the appellants was, in the district court, that the bank had not allowed the interdict interest at 5 per cent. per annum on cash balances exceeding $500. The district court, as we have said, ordered the curator's account amended so as to give the estate of the interdict credit for the interest, amounting to $72.50. The bank is complaining of the judgment in that respect.

It is not disputed that a tutor or curator is obliged to invest, in certain designated securities, the net revenues of his ward, in excess of the expenses, whenever the net revenues amount to $500; in default whereof the tutor or curator must pay interest at 5 per cent. per annum on the accumulation of revenues. Rev. Civ. Code, arts. 347 and 348. The dispute in this case arises from the fact that, among the securities which the bank invested in, for account of the interdict, were certain bonds, amounting to $7,000, which yielded a higher rate of interest than 5 per cent., but which were not such securities as the law allowed the bank to invest the interdict's money in. The bank was required, when the error was discovered, to dispose of these securities and give the interdict credit for the value of them. The bank claims, therefore, that the estate of the interdict should have credit for only 5 per cent. interest on the $7,000—as if it had not been invested,—and that the bank should have the interest which the securities actually earned. We agree with the district judge that it would be bad policy to allow a curator to profit by an unauthorized investment of the interdict's funds. The fact that the investment was not authorized by law is no reason why the interdict should not have the profit actually earned by the investment. The judgment of the district court is correct in that respect.

In the brief for the appellants, complaint is made of a fee of $500 allowed the attorneys for the curator, for defending against these oppositions. The minutes of the court show that, during the progress of the trial, the attorneys for the curator and the attorney for the opponents agreed that the judge should fix the fee at such sum as should be agreed upon by three attorneys appointed by the judge. The three attorneys appointed by the judge reported thus: "We agree that, if a fee is taxable in this case, in favor of the attorneys for the curator, for defending this opposition, the fee should be not less than $500." Thereafter this entry was made upon the minutes: "It is agreed by Mr. T. A. Edwards, representing the opponents, and Mr. S. W. Plauche, counsel for the curator, that whatever fee was recommended as being fair and reasonable by the above named lawyers [referring to the report which had been made by the committee of three lawyers] should be fixed by the court as fair and reasonable. Upon the report of the three attorneys appointed by the court, the court fixed the fee at $500.00." Our opinion is that the attorneys for the curator are entitled to the fee of $500 for defending this litigation; and it appears that the attorney for the opponents so recognized by his agreement.

The judgment is affirmed.