NOT DESIGNATED FOR PUBLICATION

# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

### 20-303

**STATE OF LOUISIANA**

**VERSUS**

**LISA W. RABALAIS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
TWELFTH JUDICIAL DISTRICT COURT
PARISH OF AVOYELLES, NO. 2019-CR-211900-B
HONORABLE WILLIAM BENNETT, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**VAN H. KYZAR**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of John D. Saunders, Van H. Kyzar, and Candyce G. Perret, Judges.

**AFFIRMED.**

**Chad P. Guillot**
**Attorney At Law**
**P. O. Drawer 158**
**Marksville, LA 71351**
**(318) 253-6656**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Lisa W. Rabalais**

**Charles A. Riddle, III**
**District Attorney**
**Anthony Francis Salario**
**Assistant District Attorney**
**12th JDC**
**P. O. Box 1200**
**Marksville, LA 71351**
**(318) 253-6587**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
    **State of Louisiana**

**KYZAR, Judge.**

Defendant appeals her conviction and sentence after having been found guilty of being an accessory after the fact to murder. For the reasons assigned herein, we affirm.

## FACTS AND PROCEDURAL HISTORY

Defendant, Lisa W. Rabalais, was charged by bill of information filed on January 22, 2019, with accessory after the fact, a violation of La.R.S. 14:25, in that "she did harbor, conceal or aid Andrew Bordelon after having grounds to believe that Andrew Bordelon had committed a felony upon Ray Paul Lachney with the intent to help him avoid escape, capture or prosecution." Trial by a six-person jury commenced on September 17, 2019.[1] She was convicted the following day of harboring, concealing, or aiding Andrew Bordelon after having grounds to believe that Bordelon had committed second degree murder or manslaughter of Lachney.

The State presented evidence at trial establishing that Ray Paul Lachney had last been seen in July 2015, and his remains were discovered in January 2016 around the intersection of Hwy. 1186 and Hwy. 1 in Avoyelles Parish. Avoyelles Parish Sheriff's Office Detective Michael Glenn Cammack testified that he was assigned the missing person case involving Lachney, who was reported missing on September 2, 2015 by his cousin, Valery Gonzales, who said he had not been seen or heard from since July 2015. Detective Cammack contacted the mother of Lachney's former girlfriend, Ms. Geraldine Ducote, who reported that Lachney was not presently in a relationship with her daughter and neither of them had seen him in some time. He was then able to determine that the last persons known to have been seen with

---

[1] *See* La.Code.Crim.Proc. art 782.

Lachney on or around July 3, 2015 were Defendant Lisa Rabalais and her boyfriend Andrew Bordelon.

On September 6, 2015, Detective Cammack questioned Defendant after informing her of her *Miranda*[2] rights. The statement was recorded on video and introduced at trial. In that statement, Defendant advised that on July 3, 2015, Lachney came to her home in Mansura, Louisiana, where she was with Andrew Bordelon, and knocked on the door at 3:00 in the morning. She invited him to stay. He was allowed to shower and Bordelon gave him some of his clothes to wear. Early that same morning the three traveled to the Zachary, Louisiana area to purchase a travel trailer that Bordelon wished to buy from a Mr. Tim McGee. Present at that location was McGee and another man, Gene Cobb. Defendant told Detective Cammack that while at that residence, some type of sexual encounter apparently occurred between McGee and Lachney, which upset Lachney.

After purchasing the trailer, Defendant, Lachney, and Bordelon rode back to Avoyelles Parish, stopping along the way at a Cracker Barrel restaurant in Zachary, a bar in Morganza, and a Shell gasoline station in Simmesport. Defendant stated that Lachney was upset during the ride and was "tripping out about it[,]" referring to the sexual encounter. According to Defendant, Lachney was concerned that he had been filmed during the sexual encounter while in Zachary and that the film would be posted to Facebook. At the intersection of Hwy. 1 and Hwy. 1186 in Avoyelles Parish, Lachney wanted to get out of the vehicle. The statement to Detective Cammack reflected that he did not get back into the vehicle and that Defendant did not see him again after that. She and Bordelon left, and Bordelon took her back to her house. Defendant did not indicate that anything else happened

---

[2] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602 (1966).

2

to Lachney or that she or Bordelon had anything to do with his disappearance. She denied that she was afraid of anyone or that she had been threatened by anyone.

Detective Cammack questioned Defendant again two days later. She gave only minor additional details including calls she made after letting Lachney out, but again stated that Lachney walked off after getting out of the vehicle at the intersection of Hwy. 1 and Hwy. 1186 and that that is the last time that she saw him. Lachney purportedly called his girlfriend, Ms. Ducote, sometime after leaving Defendant and Bordelon, though Ms. Ducote's recollection of the alleged call did not match cell tower information as acquired by Detective Cammack.

On September 11, 2015, Detective Cammack and others searched the area around the overpass at Hwy. 1186 and Hwy 1. A cadaver dog was used during the search. No body was found at that time.

On January 3, 2016, the body was discovered. Lachney's mother's boyfriend located the remains of the body in the same general area of the overpass at Hwy. 1186 and Hwy. 1. The clothing located around the remains matched the description of what Lachney had been wearing the day of his disappearance, clothes given to him belonging to Andrew Bordelon. His cell phone and driver's license were also found.

Dr. L.J. Mayeaux, Coroner for Avoyelles Parish, testified for the State. He was accepted by the court as an expert in family medical practice and forensic medicine. He testified that he was alerted that a body had been found, later identified as Ray Paul Lachney, and that his assistant went to the scene of the body. He authorized the body be turned over to the FACEs program[3] at Louisiana State

---

[3] The program was started by Dr. May Manheim, Anthropologist, through development of a computer software program to identify missing persons from their decomposed remains and has gained international recognition.

3

University to assist with identification. Although the body was badly decomposed, the victim was positively identified as Ray Paul Lachney through a comparison of his remains with his known dental records. Dr. Mayeaux did not provide a cause of death. Responding to questioning from the District Attorney "if you assume that the body was left where it was found from July 2015 until early January would it be difficult to determine the manner of death in central Louisiana[,]" Dr. Mayeaux replied, "[y]es, sir."

On cross examination, Dr. Mayeaux admitted that he had no opinion as to the cause of Lachney's death. He further stated that based on the examination of the remains, no perimortem[4] injuries or evidence of trauma could be determined. He did state that Mr. Lachney "did have one opening in the skull that was thought to be . . . because we didn't have brain tissue it was impossible to tell where that hole actually came from." On redirect, the following colloquy took place:

Q.    Concerning that report, give you a hypothetical, if a person is hit with a tire tool sufficient to knock somebody out does that necessarily fracture the skull?

A.    No[t] necessarily.

Q.    And is it almost impossible to determine if that happened after six months of laying in an undisclosed location?

A.    Correct because we had no hair, no scalp, not [sic] subcutaneous fat. And the bone we have pictures of the bone but ... we don't need to show the jury but the bones were degraded due to exposure to the elements, predation and crushing from (INAUDIBLE)...

Lana Barr also testified for the State. She stated that she was a practicing Licensed Practical Nurse and also operated a hair salon in September 2015 when she agreed to allow Defendant, a long time acquaintance, to clean up the salon as Defendant had lost her job and needed some work to pay her bills. In a conversation

---

[4] Perimortem is a pre-death condition occurring at or around the time of death.

4

that occurred around September 5, 6, or 7, 2015, Defendant brought up the subject of Lachney with her, and told her that:

> That was early part of July or something like that; h[e] had went late that night and he needed a place and it was about two or three o'clock in the morning and she had opened the door and at the time she . . . her and Andy, the gentleman Mr. Bordelon were dating but her and Ray were friends so she gave him a place to stay for a couple of days until he could get where he could either get his place or with his girlfriend, whatever it was.

She detailed how Lachney had showered and was given Bordelon's clothes to wear. Barr testified that Defendant told her that she, Bordelon, and Lachney drove together to the Baton Rouge area, Zachary or Denham Springs, for Bordelon to purchase a used travel trailer. At some point on the way home, an argument broke out between the group, and Bordelon stopped the vehicle for Lachney, who felt ill and got out of the car to throw up. Bordelon got out of the truck also, then got back in. Lachney was left there, at the intersection around Hwy. 1 and Hwy. 1186. Barr assumed that Lachney walked away. Bordelon took Defendant to her home and left her. Barr stated that Defendant told her that Bordelon came back to the home later, telling her that he killed Lachney. Barr was told by Defendant that she knew where the body was located but did state on cross examination that Defendant did not tell her that she aided in disposing of the body.

Barr also stated that Defendant told her that Bordelon was jealous of Lachney and wanted to put him out. Barr asked if that referred to the trip from south Louisiana back to Avoyelles Parish, and Defendant stated, "throughout the trip and when he was at the house because Andy wanted to put him out." She stated that Defendant did not want that; that she wanted him to stay. On cross examination she admitted that she did not make a formal statement to law enforcement until almost two years later, explaining that she did not really know the truth of any of the statements made to her by Defendant until Bordelon, who had been arrested, began to stalk her after

5

he was released on bond. At that point she began to believe that what had been told to her by Defendant was true.

Gene Cobb testified that he was present at the home of Tim McGee when Lisa Rabalais and two other men were there to look at the travel trailer on July 3, 2015. He stated that he did not know any of the three before that time. He noticed what he perceived to be significant tension between the two men. He stated that at one point, as all five of them rode to Walmart in the same vehicle, he saw Defendant with her hand on the leg of Lachney, which caused Bordelon to give Lachney a "dirty look." He described the tension as being so significant that he told Lachney on two occasions that he should not ride home with Bordelon and Defendant. He further testified that he did witness what he believed to be a sexual encounter between Lachney and McGee at McGee's house when he walked in on them, but that he quickly walked out of the house at that point. He and Bordelon did exchange words about the encounter.

Shane Brouillette testified. He indicated that he knows Defendant and considers her to be a friend. He did not wish to be testifying against her. He stated that about a year prior to trial, Defendant came to his home in Cottonport, Louisiana along with her then boyfriend and spent the night there. He stated that during the evening, she talked with him privately and told him that during the trip to Zachary, Bordelon became furious at Lachney and that at some point that day, "Andy", referring to Andrew Bordelon, grabbed a tire tool out of the back of the truck and struck Lachney in the back of the head. She did not say where this occurred but did state that she actually witnessed it. She also told him that she had to help Bordelon drop Lachney's body off. When asked on direct examination if she meant "[h]is dead body" he replied "Yes." In a later conversation, Defendant told Brouillette that the body was disposed of in the Mansura, Louisiana area. She told him that she was

6

afraid of Bordelon, that he was obsessed with her, and that he had threatened her by telling her they were both involved and that she would be in trouble too.

Defendant testified after the State rested. She stated that she was with Lachney on July 3, 2015. Defendant heard a knock on her apartment door at approximately 2:30 or 3:00 a.m. When she opened it, she saw Lachney walking away. Lachney looked like he had been on the street for a day or two, so Defendant invited him in. Lachney was allowed to shower, and Bordelon gave him some clothes to wear. The three of them went to Zachary to pick up a camper from Tim McGee. Bordelon could not hook the camper up to his truck, so they all, Defendant, Bordelon, Lachney, McGee, and Cobb, went to Wal-Mart. Defendant and Bordelon later made a second trip to Wal-Mart, while Lachney stayed with McGee and Cobb. When they returned from the store, Lachney said he was ready to leave.

Defendant testified that the three of them then left to return to Avoyelles Parish after the camper was hooked up. Lachney was upset during the return trip but not with her or Bordelon. When they got to Mansura, Bordelon pulled over by the overpass for Lachney to vomit. Lachney did not try to get back into the truck. The last Defendant saw of Lachney was him in the rearview mirror as he walked down by the overpass. She figured he was going to his girlfriend's house, as she lived in the area. Defendant testified that she did not see Bordelon do anything to Lachney. Bordelon dropped her off at her apartment, had a glass of tea, then left. This occurred at approximately 5:00 or 5:30 p.m., and Bordelon returned to her apartment around 2:00 a.m. Defendant subsequently testified that she thought Lachney got out at the overpass because he wanted to go home.

When asked to explain Barr and Brouillette's testimony, Defendant stated:

> Sir, everybody has got enemies I'm not sure why either one of them... I kind of under... it was clear yesterday why Shane Brouillette got here and said the lie that he said, he made it clear that he was staying

7

in rehab instead of looking at the charges that he was facing. Lana Barr I can't understand that, the only thing that she is my ex-husband's stepmom, I mean mother-in-law like they ... unless it had something to do with that, I have no idea why either one of them would have got [sic] up here and lied when nobody else and I'm telling you, I swear on my own sitting right there that I know nothing that I did not tell them that. And all I did was try to help [Lachney]. That's all I ever tried to do was help [Lachney]. I worked in corrections for 18 years, I have a criminal justice degree, I've seen ... I know the system, I know everything that goes on I've even worked at the sheriff's department. There's no way I would have not went to somebody immediately.

Defendant said she did not hear anything about Lachney from July 3 until September 5. She saw a Facebook post from Gonzales indicating Lachney was missing and immediately called the sheriff's department to speak to an investigator. Bordelon was at her apartment at that time, and he voluntarily gave a statement to police as well. Detective Cammack called her and instructed her and Bordelon to be at the overpass at daylight. They subsequently followed him to the sheriff's department and gave a statement.

Defendant testified that she knew nothing about Lachney's death. She said Barr and Brouillette lied. She admits that she may have talked to them about the case, "[b]ut there's no way in this world [she] gave them detail like they said." Defendant indicated they were her friends, so she did tell them she went to Zachary, had to go to Wal-Mart for something for the camper, and about their stops along the route home. However, Barr and Brouillette purportedly made up what occurred after the stop in Mansura. Defendant was further questioned about Barr's testimony:

Q.    And you understand that Lana Barr says that [Lachney] walked down the hill that you told her [Lachney] walked down the hill?

A.    O.K.

Q.    And that ya'll drove off without him?

A.    Yes, sir.

Q.    Is that correct or not correct?

8

A.     Yes, sir.  At that times whenever they spoke to me about it is when [Lachney] was standing next to me.  It's the same story I told ...  I mean anybody that said what do you know about the guy that's missing from Mansura, I heard that you and [Bordelon] were the last ones to see him.  Yeah and this is what happened.  That's why they had details.

Defendant asserted that Barr's testimony that she told Barr that Bordelon said he killed Lachney was not correct.  Additionally, she maintained that she did not tell Brouillette that Bordelon hit Lachney with a tire tool.   Furthermore, Cobb's testimony regarding hostility was not true.  Defendant stated that Cobb was hostile.  Defendant testified that Lachney and McGee almost got into a fight on the road when they were leaving with the camper.  When asked if "[t]hese people" had a motive for doing this, Defendant responded, "Shane Brouillette well made that clear that there was a deal made with him to be able to stay in rehab for that testimony that he gave yesterday."  She then stated, "Lana Barr is just an enemy that I had no idea I had."  Defendant stated Cobb "was trying to get the monkey off his back maybe or scared that they would try to say something about him and [McGee] and what happened with [Lachney]."

Defendant admitted that she had probably told people she was scared of Bordelon.  She states she was afraid because Bordelon had to turn himself in a couple of days after the incident to "be locked up for two years" for something unrelated to Lachney's death.

Defendant testified that while this was not the first time Lachney had gone to her house for the weekend, it was the first time Lachney and Bordelon had met.  Bordelon was not aware she had dated Lachney in the past.  She asserts that she did not get upset with Lachney on their return trip and she does not know what happened to Lachney when he got out of the truck that day.  She concluded "I would never protect nobody."

9

At the conclusion of the trial, the jury returned a guilty verdict. On November 12, 2019, Defendant was sentenced to serve five years at hard labor. Defendant thereafter filed a Motion to Reconsider Sentence on December 10, 2019, which was denied. On December 11, 2019, Defendant filed a "Notice of Appeal with Designation of Record."

Defendant is now before this court asserting five assignments of error, as follows:

1. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that the principal, Andrew Bordelon, committed an intentional homicide against Ray Paul Lachney.

2. The evidence introduced at the trial of this case, when viewed under the *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) standard, was insufficient to prove beyond a reasonable doubt that Lisa Rabalais harbored, concealed, or aided Andrew Bordelon after knowing or having reasonable ground to believe that Andrew Bordelon had committed an intentional homicide against Ray Paul Lachney, and that Lisa Rabalais harbored, concealed, or aided with the intent that Andrew Bordelon may avoid or escape from arrest, trial, conviction, or punishment.

3. The trial court erred when it did not grant a mistrial upon Detective Glenn Cammack testifying as to "other crimes evidence" allegedly committed by Lisa Rabalais.

4. The trial court erred by allowing the State to elicit testimony from Lana Barr as to what Lisa Rabalais told her Andrew Bordelon said, under the guise of it not being offered for the truth of the matter asserted.

5. The trial court erred by not allowing the Defendant to state what was told to her by the alleged victim, even though it was not being offered for the truth of the matter asserted.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed for errors patent on the face of the record. After reviewing the record, we find there are no errors patent.

## DISCUSSION

10

## Sufficiency of the Evidence

In her first assignment of error, Defendant contends the evidence introduced at the trial of this case, when viewed under the standard of *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781 (1979), was insufficient to prove beyond a reasonable doubt that the principal, Andrew Bordelon, committed an intentional homicide against Ray Paul Lachney. In her second assignment of error, Defendant contends the evidence was insufficient to prove beyond a reasonable doubt that she harbored, concealed, or aided Bordelon after knowing or having reasonable grounds to believe that Bordelon had committed an intentional homicide against Lachney, and did so with the intent that Bordelon may avoid or escape from arrest, trial, conviction, or punishment. As each assignment questions the sufficiency of the evidence to sustain the conviction, we address them together.

Defendant was convicted of being an accessory after the fact to a felony committed by Bordelon on the victim, Lachney, in violation of La.R.S. 14:25, which states:

> An accessory after the fact is any person who, after the commission of a felony, shall harbor, conceal, or aid the offender, knowing or having reasonable ground to believe that he has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment.
>
> An accessory after the fact may be tried and punished, notwithstanding the fact that the principal felon may not have been arrested, tried, convicted, or amenable to justice.

The bill of information charges Defendant as an accessory by aiding Bordelon after he committed a felony upon Lachney. The State and Defendant stipulated prior to trial that the felony involved and that must be proven was the intentional murder

11

of Lachney.[5] In brief to this court, the parties agree that the felony was an intentional homicide, either second degree murder or manslaughter. During trial, there was reference to the prior stipulation that the felony was an intentional homicide, but that stipulation is not found in the record. In conference outside the presence of the jury, the trial court discussed the applicability of second-degree murder and manslaughter with counsel. The trial court's instructions to the jury ultimately included the definitions of second-degree murder, found in La.R.S. 14:30.1(A)(1), and manslaughter, found in La.R.S. 14:31(A):

Second degree murder is the killing of a human being:

> (1) When the offender has a specific intent to kill or to inflict great bodily harm[.]

. . . .

Manslaughter is:

> (1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
>
> (2) A homicide committed, without any intent to cause death or great bodily harm.
>
>> (a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Article 30 or 30.1, or of any intentional misdemeanor directly affecting the person

---

[5] We note that our law does not include an offense for intentional homicide, and that a homicide may be committed without the intent to kill but only to inflict great bodily harm, or a death occurring without any intent to kill but where a misdemeanor against the person causes a death. La.R.S. 14:30 and La.R.S. 14:31. Each of these would require the intent to commit the underlying offense.

12

Neither party objected to this instruction, nor did Defendant assign any error to such. Thus, to convict Defendant, the State was required to prove beyond a reasonable doubt that: 1) a completed felony (either second degree murder or manslaughter) had been committed by Bordelon before Defendant rendered him assistance; 2) Defendant knew or had reasonable grounds to know of the commission of the felony by Bordelon; and 3) Defendant gave aid to Bordelon personally under the circumstances that indicate either she actively desired that Bordelon avoid or escape arrest, trial, conviction, or punishment or she believed that one of these consequences was substantially certain to result from her assistance. *State v. Chism*, 436 So.2d 464 (La.1983).

> The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude that the prosecution proved . . . all of the requisite elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). The *Jackson* standard of review is an objective standard for testing all of the evidence, both direct and circumstantial, for reasonable doubt. *State v. Marcantel*, 00-1629 (La.4/3/02), 815 So.2d 50. The trier of fact is presumed to have acted rationally until it appears otherwise. *State v. Mussall*, 523 So.2d 1305 (La.1988).

*State v. Newton*, 12-511, p. 3 (La.App. 3 Cir. 2/13/13), 129 So.3d 20, 22.

> [A] person may be punished as an accessory after the fact if he aids an offender personally, knowing or having reasonable ground to believe that he has committed the felony, and has a specific or general intent that the offender will avoid or escape from arrest, trial, conviction, or punishment. See [La.]R.S. 14:10; *State v. Jackson*, [344 So.2d 961 (La.1977)]; W. Lafave & A. Scott, Criminal Law § 66 at 522-23 (1972); R. Perkins, Criminal Law § 8.4 at 667 (2d ed. 1969).

> An accessory after the fact may be tried and convicted, notwithstanding the fact that the principal felon may not have been arrested, tried, convicted, or amenable to justice. La.R.S. 14:25. However, it is still necessary to prove the guilt of the principal beyond a reasonable doubt, and an accessory after the fact cannot be convicted or punished where the principal felon has been acquitted. *Id.* Reporter's Comment. *State v. Prudhomme*, 171 La. 743, 129 So. 736 (1930); *State v. Philip*, 169 La. 468, 125 So. 451 (1929). Furthermore, it is essential to prove that a felony was committed and completed prior

13

to the time the assistance was rendered the felon, although it is not also necessary that the felon have been already charged with the crime. La.R.S. 14:25; See Lafave & Scott, *supra*.

*Chism*, 436 So.2d at 467 (footnote omitted).

"A person cannot be convicted as an accessory after the fact to a murder because of aid given after the murderer's acts but before the victim's death, but under these circumstances the aider may be found to be an accessory after the fact to the felonious assault." *Id.* at 468. Further, "the focus of [La.R.S. 14:25] is on the person who *aids* the offender who committed a felony, not on the status of the person who committed the felony." *State v. Gregory*, 99-291, p. 6 (La.App. 3 Cir. 10/13/99), 745 So.2d 723, 726

We find the review and analysis by our supreme court in a close sufficiency of the evidence case particularly apt to the case at hand. In *State v. Mussall*, 523 So.2d 1305 (La.1988), the supreme court reviewed and affirmed the decision of the court of appeal reversing the trial court conviction of the defendant for armed robbery, noting the peculiar facts of the case:

> This is a close case demanding an accurate, precise study of the appropriate legal precepts and the methods of their application. The armed robbery conviction is supported exclusively by the uncorroborated testimony of an eye witness. Unimpeached documentary evidence and several eccentricities in the victim's story tend to cast doubt on whether any robbery occurred. We are confronted with forceful conflicting arguments that a reviewing court must, on the one hand, give deference to the trier of fact's credibility call, and, on the other, reverse if no rational trier of fact would have found guilt beyond a reasonable doubt based upon the whole record. Accordingly, before applying the reasonable doubt or sufficiency of evidence standards, further study of their purpose and underlying principles is required.

*Id. at* 1308.

Likewise, we find the facts of the instant matter to present a close case, demanding precision in the application of the law related to review of verdicts based on sufficiency of evidence.

14

## REASONABLE DOUBT

The United States Supreme Court has explicitly held that the Due Process Clause of the Fourteenth Amendment protects each person accused of a crime against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged. *In re Winship*, 397 U.S. 358, 368, 90 S.Ct. 1068, 1075, 25 L.Ed.2d 368, 377-78 (1970). The ancient demand for a higher degree of persuasion in criminal proceedings and the virtually unanimous acceptance of the reasonable doubt standard reflect a profound judgment about the way in which law should be enforced and justice administered. *In re Winship*. supra, 397 U.S. at 361, 90 S.Ct. at 1071, 25 L.Ed.2d at 373-74; McCormick, On Evidence, § 341, at 962 (3rd ed. 1984); 9 J. Wigmore, Evidence, § 2497, at 317 (3rd ed. 1940); see *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968). The accused during a criminal prosecution has at stake interests of immense importance, both because of the possibility that he may lose his liberty upon conviction and because of the certainty that he would be stigmatized by the conviction. *In re Winship*, supra, 397 U.S. at 363, 90 S.Ct. at 1072, 25 L.Ed. at 375. The reasonable-doubt standard is a prime instrument for reducing the risk of a deprivation of his good name or freedom based on factual error, thus providing concrete substance to his presumption of innocence. To this end, the reasonable doubt standard is indispensable, for it places on the other party the burden of persuading the fact finder of the guilt of the accused beyond a reasonable doubt, and it impresses on the trier of fact the necessity of reaching a subjective state of certitude on the facts in issue, rather than merely performing an abstract weighing of the evidence in order to determine the quanta produced. *In re Winship*, supra, 397 U.S. at 364, 368, 90 S.Ct. at 1072, 1074, 25 L.Ed.2d at 375, 377; Dorsen & Rezneck, In re Gault and the Future of Juvenile Law, 1 Family Law Quarterly, No. 4, 1, 26-27 (1967). Moreover, use of the reasonable doubt standard is indispensable to command the respect and confidence of the community in applications of the criminal law, *In re Winship*, supra, 397 U.S. at 364, 90 S.Ct. at 1073, 25 L.Ed.2d at 375, and is bottomed on a fundamental value determination of our society than [sic] it is far worse to convict or stigmatize an innocent person than to let a guilty person go free. *In re Winship*, supra, 397 U.S. at 372, 90 S.Ct. at 1077, 25 L.Ed.2d at 380 (Harlan, J., concurring.)

## SUFFICIENCY OF EVIDENCE

In *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), the Supreme Court granted certiorari to consider the petitioner's claim that under *In re Winship*, supra, a federal habeas corpus court must consider not whether there was any evidence to support a state-court conviction, but whether there was sufficient evidence to justify a rational trier of the facts to find guilt beyond a reasonable doubt. In deciding the question, the high court held that Fourteenth Amendment Due Process requires a federal court reviewing a state conviction to do more than determine whether the reasonable

doubt instruction had been given at trial and whether there was any evidence to support the conviction. Additionally, Due Process requires the reviewing court to determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, supra, 443 U.S. at 319, 99 S.Ct. at 2789, 61 L.Ed.2d at 573.

Shortly after *Jackson v. Virginia* was decided, this court, in opinions by Justice Tate, recognized that although the issue arose in terms of federal habeas review, the *Jackson* holding also applies to state direct review of criminal convictions, and began to apply it in state criminal appeals. *State v. Abercrombie*, 375 So.2d 1170, 1177-1178 (La.1979), cert. denied, *Abercrombie v. Louisiana*, 446 U.S. 935, 100 S.Ct. 2151, 64 L.Ed.2d 787 (1980); *State v. Mathews*, 375 So.2d 1165, 1167-1169 (La.1979). Despite a few erroneous but ineffectual statements to the contrary, e.g., *State v. Main Motors, Inc.*, 383 So.2d 327, 328 (La.1979), the *Jackson* doctrine has in fact been applied by this court ever since. *State v. Rosiere*, 488 So.2d 965, 968 (La.1986); *State v. Captville*, 448 So.2d 676, 678 (La.1984); *State v. Allen*, 440 So.2d 1330, 1333 (La.1983); *State v. Dykes*, 440 So.2d 88, 93 (La.1983); *State v. Sutton*, 436 So.2d 471, 474-475 (La.1983); *State v. Chism*, 436 So.2d 464, 466 (La.1983); *State v. Johnson*, 426 So.2d 95, 101 (La.1983) (citing cases); *State v. Richardson*, 425 So.2d 1228, 1230-1231 (La.1983); *State v. Graham*, 422 So.2d 123, 129 (La.1982), appeal dismissed, *Graham v. Louisiana*, 461 U.S. 950, 103 S.Ct. 2419, 77 L.Ed.2d 1309 (1983); *State v. Ennis*, 414 So.2d 661, 663 (La.1982); *State v. Moody*, 393 So.2d 1212, 1215 (La.1981); *State v. White*, 389 So.2d 1300, 1301 (La.1980); *State v. Morgan*, 389 So.2d 364, 366 (La.1980); *State v. Harveston*, 389 So.2d 63, 64 (La.1980); *State v. Hartman*, 388 So.2d 688, 694 (La.1980); *State v. Byrd*, 385 So.2d 248, 250 (La.1980); *State v. Landry*, 381 So.2d 462, 466 (La.1980).

Moreover, the constitution and laws of Louisiana afford bases for an equally rigorous state standard of review. The Legislature has embraced the federal Due Process doctrine by adding La.C.Cr.P. art. 821 through Act No. 144 of 1982, which establishes a *Jackson*-like standard for post verdict motions for acquittal based on insufficiency of evidence. See *State v. Captville*, supra, 448 So.2d at 678. Our state constitution's due process clause is virtually identical to its Fourteenth Amendment model. La. Const., Art. I, § 2. The explicit right of a person accused of a crime to be presumed innocent until proven guilty provides an additional guarantee against criminal conviction based on inadequate evidence. La. Const., Art. I, § 16. The guarantee that no person shall suffer "imprisonment or forfeiture of rights or property ... without the right of judicial review based upon a complete record of all evidence upon which the judgment is based" indicates that a reviewing court must base its decision upon all of the evidence. La. Const., Art. I, § 19.

The *Jackson v. Virginia* doctrine involves more than simply applying a fixed standard to measure the simple quantum of the evidence produced in a case. Careful study must be given to both the majority and concurring opinions to fully understand the precise methodology which must be followed to determine objectively whether any rational trier of fact would have had a subjective doubt about the defendant's guilt. First, a review of a criminal conviction record for sufficiency of evidence does *not* require a court to " 'ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt[.]' " Second, a reviewing court must consider the record through the eyes of a hypothetical rational trier of fact who interprets all of the evidence as favorably to the prosecution as any rational fact finder can. Third, the inquiry requires the reviewing court to ask whether such a hypothetical rational trier of fact interpreting all of the evidence in this manner could have found the essential elements of the crime beyond a reasonable doubt.

The principal criterion of a *Jackson v. Virginia* review is *rationality*. This is because under *Winship* and *Jackson* Fourteenth Amendment due process demands that in state trials, as has been demanded traditionally in federal trials, a criminal conviction cannot constitutionally stand if it is based on a record from which no *rational* trier of fact could find guilt beyond a reasonable doubt. Accordingly, under the *Jackson* methodology a reviewing court is required to view the evidence from the perspective of a hypothetical *rational* trier of fact in determining whether such an unconstitutional conviction has occurred. In reviewing the evidence, the whole record must be considered because a *rational* trier of fact would consider all of the evidence, and the actual trier of fact is presumed to have acted *rationally* until it appears otherwise. If *rational* triers of fact could disagree as to the interpretation of the evidence, the *rational* trier's view of all of the evidence most favorable to the prosecution must be adopted. Thus, *irrational* decisions to convict will be overturned, *rational* decisions to convict will be upheld, and the actual fact finder's discretion will be impinged upon only to the extent necessary to guarantee the fundamental protection of due process of law.

The *Jackson* doctrine or methodology is a compromise between the one extreme that maximizes the protection against the risk that innocent persons will be erroneously convicted by appellate replication of criminal trials and the other extreme that places the greatest faith in the ability of the triers of facts to produce just verdicts. Not only did the Supreme Court abjure any requirement that a reviewing court retry the issue of guilt, but it also rejected all forms of limited review under which a partial or one-dimensional view of the evidence is accepted as an index of its actual probative value. The *Jackson* doctrine does not permit the reviewing court to view just the evidence most favorable to the prosecution and then to decide whether that evidence convinced it beyond a reasonable doubt. Nor does it require a court to decide whether, based on the entire record, the *average* rational trier of fact could be convinced of guilt beyond a reasonable doubt. And of course,

17

the high court abrogated the "no evidence" rule of *Thompson v. Louisville*, 362 U.S. 199, 80 S.Ct. 624, 4 L.Ed.2d 654 (1960) because "it could not seriously be argued that ... a modicum of evidence could by itself rationally support a conviction beyond a reasonable doubt."

The Supreme Court's opinion in *Jackson v. Virginia* contains various formulations of the sufficiency of evidence rule. The court also appears to equate that rule with the federal motion for acquittal and direct-review rules. The leading federal practice commentators have taken the position that despite the verbal variations each formulation requires the same analysis.

*Mussall*, 523 So.2d at 1308–11 (footnotes omitted).

While the court in *Mussall* concluded that the court of appeal was correct in its findings that no rational trier of fact could have concluded guilt beyond a reasonable doubt, it recognized that "in this particular case even a reasonably pro-prosecution rational trier of fact is driven to have a reasonable doubt by the numerous eccentricities, unusual coincidences and lack of corroboration[.]" *Id.* at 1311. The supreme court noted "[t]he striking coincidences between Siebenkittel's lawsuit and that of the shrimp contract plaintiffs - including the identities of the lawyer, law office, defendant, date of affidavit, filing and service", "[t]he lack of any corroboration of a daylight armed robbery on a French Quarter sidewalk despite a complete and accurate identification by name of the robber given to the police within 10 to 12 minutes of the crime", the "eccentricities of Siebenkittel's story" including that he responded to an unplanned and unsolicited phone call regarding a potentially available boat by "liquidating his $4,000 savings, borrowing $2,000 more from his sister at 18½%, and rushing off to meet the caller with $6,000 cash in his pocket, without first inspecting the boat or talking to the owner of the boat about price", and then that "an armed robber who calls in advance of the crime to renew acquaintances with his victim, uses his correct name and leaves his home phone number so that he cannot fail to be identified." *Id.* at 1311-1312. This and other skeptical evidence in

18

the view of the supreme court "contributes to the creation of a reasonable doubt in the mind of any rational trier of fact." *Id.* at 1312.

With the same precision in applying the evidence of the case at hand to the law of sufficiency review, we find sufficient evidence, viewed in the light most favorable to the prosecution, to support the jury's verdict. Here, there are no telling eccentricities, unusual coincidences, and lack of corroboration of key elements.

While much is discussed in brief that the case consists entirely of circumstantial evidence as to the cause of death and surrounding circumstances, this is not wholly correct. Much of the inculpatory evidence in the case came from Defendant's own statements. In *State v. Richardson*, 16-107, pp. 26-7 (La.App. 3 Cir. 12/28/16), 210 So.3d 340, 358, another panel of this court addressed the sufficiency of evidence consisting primarily of a defendant's statements.

> "The term "admission" is applied to those matters of fact which do not involve criminal intent; the term "confession" is applied only to an admission of inculpatory facts and a confession of guilt." *State v. Marr*, 626 So.2d 40, 45 (La.App. 1 Cir. 1993) (quoting *State v. Jones*, 451 So.2d 35 (La.App. 2 Cir.), *writ denied*, 456 So.2d 171 (La.1984)), *writ denied*, 93-2806 (La. 1/7/14), 631 So.2d 455. In *State v. Boothe*, 532 So.2d 203, 206 (La.App. 3 Cir. 1988), a panel of this court explained that there are three categories of incriminating statements:
>
>> The first category is the confession which admits the guilt of the crime charged. The second is the admission which involves the existence of criminal intent. The third is the admission or acknowledgment of facts which tend to establish guilt, but which do not involve the existence of criminal intent. The Court concluded that remarks which were not express admissions of guilt or facts showing criminal intent can be introduced without the foundation necessary for admitting a confession, despite the fact that the statements might be considered inculpatory.
>
> In this context, the distinction between a confession and an admission is that a confession is considered direct evidence while an admission is considered circumstantial evidence. *State v. Hunter*, 39,664 (La.App. 2 Cir. 6/29/05), 907 So.2d 200, *writ denied*, 05-2027 (La. 3/10/06), 925 So.2d 507.

19

An inculpatory statement is "one that refers to the out-of-court admission of incriminating facts made by the accused after the crime has been committed" and "relates to past events." *State v. Glover*, 343 So.2d 118, 120 (La.1976). This definition includes those statements made by Defendant to Barr and Brouillette and which were relayed to the jury during their testimony.[6]

Statements from Defendant as a witness to the events are not only circumstantial evidence, but in some respects are also direct evidence; her admissions introduced into evidence may be considered direct substantive evidence. *See State v. Smith*, 98-1417 (La. 6/29/01), 793 So.2d 1199, *cert. denied*, 535 U.S. 937, 122 S.Ct. 1317 (2002). The evidence given by Defendant being that Lachney was murdered. Brouillette testified that Defendant told her Lachney was killed by Bordelon. He testified that Defendant told him that Bordelon struck Lachney in the head with a tire tool, and that she aided him in hiding the "dead" body. This evidence is corroborated by other evidence, including the testimony of Barr and of Detective Cammack as to the location of the body near the overpass at Hwy. 1186 and Hwy. 1 in Avoyelles Parish and the detective's testimony tracing Lachney through video cameras and banking records along the route back to Avoyelles Parish the last day he was seen alive. It was corroborated by the testimony of Cobb who related the events occurring during the purchase of the travel trailer, placing Defendant, Bordelon, and Lachney together and noting the extreme tension between Lachney and Bordelon, such that he advised Lachney not to ride back with the other two. It was corroborated by the clothing that the victim, Lachney, was wearing when his remains were found, clothing that belonged to Bordelon. It was further supported by the testimony of Dr. Mayeaux stating that although he could not specify a cause

---

[6] The hearsay objection to a portion of Barr's testimony and the effect thereof is discussed below.

of death because of the body decomposition, a blow to the head would not necessarily have caused a skull fracture.

In ruling on the motion for post judgment verdict of acquittal, the trial court stated as follows:

> Well Article 821 of the Code of Criminal Procedure provides that a Motion for Post Verdict Judgment of Acquittal the court, that's me, is to look at the evidence in a light most favorable to the State to see whether or not reasonably presents a finding of guilt. In doing so I am not to make a credibility call. Credibility calls were made by the jury. And there's the same standard of sufficiency of evidence, not the weight of the evidence, it's sufficiency of the evidence for direct evidence crimes and circumstantial evidence crimes.
>
> In the case of State versus Brown, 77 So.3d 297, it was held that when a case involves circumstantial evidence and the trier of fact, that being the jury, reasonably rejects a hypothesis of innocence presented by the defense, that hypothesis fails. And the defendant is guilty unless there is another hypothesis that the defendant is guilty beyond a reasonable doubt. The circumstantial evidence in this case was presented to the jury, they were the finders of fact, they obviously believed the testimony of Ms. Barr and Mr. Brouillette and some of the testimony of Dr. Mayeux that was ... although he said he could not say beyond a reasonable doubt that it was by trauma, he couldn't rule it out.
>
> The evidence in a light viewed most favorable to the State of Louisiana clearly, clearly supports the jury's finding of guilt. It's not a question of how I would have voted or what I found, the jury was the trier of fact and they found Ms. Rabalais guilty, thus it was a circumstantial evidence case, but the other hypothesis of innocence were [sic] obviously rejected. Therefore the Motion for Post-Verdict Judgment of Acquittal is denied.

We agree with the well-reasoned analysis of the trial court. The jury considered the testimony of the witnesses, including Barr, Brouillette, Cobb, and Defendant herself, along with others. Defendant argues that the testimony of Brouillette was suspect because of a testimonial deal with the State, and that Barr should not be believed given the time delay in her going to authorities. Counsel for Defendant attempted to impeach Barr and Brouillette with this very evidence at trial, and Defendant postulated during her testimony that they were lying as well. Despite this, the jury accepted the version of events as told by Brouillette and Barr, bolstered

21

by the testimony of Cobb, Dr. Mayeaux, and others, including descriptions of the physical evidence. Further, while there was evidence of a phone call between Lachney and Ms. Ducote, his girlfriend, on the day of the crime, there was a discrepancy between Detective Cammack's evidence of the cell tower information and Ms. Ducote's recollection that the conversation occurred in the afternoon hours, not 7:26 in the evening as Detective Cammack testified, as reflected in Ms. Ducote's testimony.

Q.    O.K.    Do you know an approximate time of when this conversation occurred?

A.    I guess if I had to remember it was ...

Q.    Was it morning, afternoon?

A.    It was afternoon. It was I waited until he got off from work ... that I knew that he got off from work. Because t[]he people he worked for is people we went to church with. So I knew when about what his schedule was. So it was later, it was after work, it was after work. It was afternoon.

In addition to this discrepancy as to the timing of the call, which the jury was free to weigh and accept or reject, we note that the only evidence as to the time that the victim was left at the area where his remains were ultimately recovered came from Defendant herself. It is worth repeating that the area where Lachney was left was searched September 11, 2015, after Defendant and Bordelon had been questioned, and no body was found. The body was, however, located in the same area in January 2016. Thus, the jury was free to infer from the evidence whether Defendant was telling the truth, or fabricating her story.

Defendant herself gave multiple, various accounts as to what occurred the day that Lachney went missing. She was interviewed by Detective Cammack on September 6 and again on September 8, 2015, due to conflicts between statements given by her and Bordelon. Defendant did not tell Detective Cammack that she

22

knew where Lachney's body was or advise that Bordelon injured Lachney or caused his death, as she had purportedly said to Barr and Brouillette. In fact, Detective Cammack testified that he perceived that Defendant was not telling him everything she knew about what happened to the victim. At trial, Defendant continued to deny any knowledge of what happened to Lachney after he exited the car on the way back to Avoyelles Parish. She also testified unequivocally that she tried to call Lachney later after he had been left at the overpass. Noticeably lacking, however, was any corroborating evidence of this statement.

"[T]he jury was free to believe or not to believe all or part of [any witness's] testimony." *State v. Dugar*, 93-718, p. 13 (La.App. 3 Cir. 10/5/94), 643 So.2d 870, 878, *writ denied*, 94-2712 (La. 6/30/95), 657 So.2d 1019. The jury directly observed and heard the witnesses as they testified and are best able to judge the demeanor and assess the credibility of testifying witnesses. "[I]t is well-settled jurisprudence that the testimony of a single witness is sufficient to support a conviction, absent internal contradictions or irreconcilable conflicts with physical evidence, even where the State does not introduce medical, scientific, or physical evidence" and "[t]he credibility of the witness is a matter of weight, and not sufficiency, of the evidence, and the determination of credibility is left to the trier-of-fact's sound discretion and will not be re-weighed on appeal." *State v. Navarre*, 15-920, p. 2 (La.App. 3 Cir. 4/6/16), 188 So.3d 478, 480, *writ denied*, 16-800 (La. 5/1/17), 220 So.3d 742 (internal citations omitted).

Considering the entire record of evidence presented to the jury, and the trier of fact being presumed to have acted rationally as it is not shown otherwise, we are compelled to affirm the conviction. While we could conceivably disagree as to the interpretation of the evidence adopted by the jury, the rational trier's view of all of the evidence most favorable to the prosecution must be adopted. *Mussall*, 523 So.2d

23

1305. Accordingly, we affirm the conviction based on sufficient evidence supporting the jury's verdict.

### *Other Crimes Evidence*

Defendant next asserts that the trial court erred when it did not grant a mistrial upon Detective Cammack testifying as to "other crimes evidence" allegedly committed by Defendant. More specifically, during the trial, Detective Cammack was asked by the representative of the State if he questioned Defendant regarding whether she had any information concerning the victim, Lachney. Detective Cammack responded "Yes", and then proceeded to state "[Defendant] said they got up the next morning early. She said they went and purchased . . . to Echo and purchased some crystal meth." Defense counsel objected and moved for a mistrial. Although the motion for mistrial was denied, the trial court did admonish the jury to disregard the statement.

> Upon motion of a defendant, a mistrial shall be ordered when a remark or comment, made within the hearing of the jury by the judge, district attorney, or a court official, during the trial or in argument, refers directly or indirectly to:
>
> . . . .
>
> (2) Another crime committed or alleged to have been committed by the defendant as to which evidence is not admissible;

La.Code Crim.P. art. 770.

Defendant concedes that the statement was not made by the judge, district attorney, or court official so as to warrant a mandatory mistrial pursuant to the code. *Id.* Louisiana Code Criminal Procedure Article 771(2) provides that when a remark or comment is "made by a witness or person other than the judge, district attorney, or a court official, regardless of whether the remark or comment is within the scope of Article 770[,]" the trial court shall admonish the jury to disregard the remark when

24

the remark is irrelevant or immaterial and of such a nature that it might create prejudice against the defendant, or the state, in the mind of the jury. This applies to such comments on other crimes evidence by law enforcement officers. "In such cases, on motion of the defendant, the court may grant a mistrial if it is satisfied that an admonition is not sufficient to assure the defendant a fair trial." *Id.*

> An investigating officer is a witness, but is closely related to the district attorney in presentation of the prosecutor's case. Therefore, a prejudicial remark by an experienced police officer should be viewed with considerable concern as to the fairness of the trial, and may require granting a mistrial, especially if the remark was precipitated by or should have been anticipated by the district attorney. Nevertheless, the decision as to the necessity of granting a mistrial in these circumstances was left to the sound discretion of the trial court. See *State v. Madison*, 345 So.2d 485 (La.1977); *State v. Brown*, 322 So.2d 211 (La.1975); *State v. Schwartz*, 354 So.2d 1332 (La.1978). The present case does not reveal a manifest abuse of discretion warranting the substitution of our judgment for that of the trial judge who conducted the trial, heard the remark, and was in the best position to assess its impact.

*State v. Douglas*, 389 So.2d 1263, 1266 (La.1980).

In this case, we find no error in the trial court's decision to admonish the jury to disregard the statement rather than grant a mistrial. The statement clearly fell under the umbrella of La.Code Crim.P. art. 771's discretionary mistrial provisions. We find no abuse of that discretion here.

### *Hearsay Admissions from Lana Barr*

Defendant next asserts that the trial court erred by allowing the State to elicit testimony from Lana Barr as to what Defendant told her Bordelon said, under the guise of it not being offered for the truth of the matter asserted. During the course of trial, Barr was asked by the State's representative if Defendant made any statements to her as to what Bordelon said to Defendant, to which she replied "Yes." Counsel for Defendant objected to the statements as hearsay. In ruling on the objection, the trial court permitted Barr to testify as to what Defendant told her was said by Bordelon, as the following colloquy from the trial transcript reflects:

25

Q.  O.K., Ms. Barr.  Did [Defendant] tell you that [Bordelon] made any comments?

A.  When we were talking in my office?

Q.  Yes.  About when he returned that night?

A.  Yes.  The third time that she came in she was very upset and said that she blurted out that [Bordelon] had by the time when he got back in, he came in and he was very agitated, upset and stuff saying I killed [Lachney], I killed him.

Q.  Did he indicate ... were there any statements about the location of [Lachney]?

A.  Not at that time.

Q.  At any time by [Defendant] to you?

A.  It wasn't a direct statement, she said that [Bordelon] said it would be a good place to hide the body.

. . . .

Q.  And you were talking about the location?

A.  Yes.  She was ... like I said she was upset and saying that he told her that it would be a good place to hide the body like through the woods where the tracks would be and stuff.

Q.  And that's the ... the overpass ...

A.  The overpass coming through Mansura like from Moreauville to Mansura.

Q.  The northbound ... going towards Marksville?

A.  Yes.

Q.  O.K.

A.  I mean I go home so I went to the left.  So coming towards Marksville or wherever, then like if I'm going towards Simmesport it would have been to the left, if you're coming from Simmesport to Marksville it would have been to the right.


In order to establish that Defendant was an accessory to the crime, the State was required to prove that she acted "knowing or having reasonable ground to

26

believe that he [Bordelon] has committed the felony, and with the intent that he may avoid or escape from arrest, trial, conviction, or punishment." La.R.S. 14:25. While the evidence may not have been admissible to prove that Bordelon in fact committed murder, it was relevant to establish what Defendant knew or may have known at the time. The trial court instructed the jury that the statements as to what Bordelon said were not offered for the truth of the statements but only that Defendant said them. The actual instruction to the jury was as follows:

> [Y]es. Ms. Barr is testifying about what [Defendant] told her. Some of the things that [Defendant] told her may include something someone told [Defendant]. Those statements are not being offered for the truth of what was told to [Defendant] then told to Ms. Barr, only that Ms. Barr is saying that that's what [Defendant] said. It's not to say that whatever she said was told to her . . . that what [Defendant] said was [said] to her is necessarily true only this is [Defendant] saying it to Ms. Barr, okay.

"Hearsay is not admissible except as otherwise provided by this Code or other legislation." La.Code Evid. art. 802. If a statement made by a declarant out of court is offered into evidence for a purpose other than to prove that the matter asserted is true, the statement is not hearsay. *State v. Smith*, 11-91 (La.App. 4 Cir. 7/11/12), 96 So.3d 678, *rehearing denied, writ denied*, 12-2069 (La. 3/15/13), 109 So.3d 375. The statement here, made by Defendant herself as to what Bordelon purportedly said to her, was not offered to prove that Bordelon actually killed Lachney, but was offered to show Defendant's state of mind and what she knew or may have known about what occurred, an element necessary for the State's case against Defendant. In that regard, Defendant concedes in brief to this court that the statements were not hearsay, considering they were statements against her interest made admissible by La.Code Evid. art. 801(D)(2)(a). "[A] trial court's ruling on the admissibility of evidence will not be disturbed in the absence of a clear abuse of the trial court's discretion." *State v. Bernard*, 14-580, p. 17 (La. App. 4 Cir. 6/3/15), 171 So.3d 1063,

27

1075, *writ denied*, 15-1322 (La. 6/17/16), 192 So.3d 776, *cert. denied*, ___ U.S. ___, 137 S.Ct. 387 (2016).  There was no such abuse of discretion by the trial court here.

### *Sustaining the State's Hearsay Objection*

Lastly, Defendant asserts that the trial court erred by not allowing the Defendant to state what was told to her by the alleged victim, arguing that it was not being offered for the truth of the matter asserted.  Defendant argues similarly to the State's position regarding Defendant's testimony as to what Lachney told her in the car coming home from Zachary, Louisiana on July 3.  Specifically, Defendant attempted to introduce a statement by the victim, Lachney, that he was upset because of a homosexual encounter he had with Timothy McGee in Zachary when the group went to look at and ultimately purchase a trailer.  According to Defendant, this offer of evidence was in an attempt to explain why Lachney was upset on the way home and why he requested to get out of the truck at the overpass.  The State objected to the statement on the basis of hearsay, and the trial court sustained the objection.

Q.    O.K.   When you got back from Wal-Mart, did you notice anything strange with [Lachney]?

A.    I did.

Q.    What did you notice?

A.    [Lachney] come up to me and he was like [Defendant's name] I'm ready to go.  And I was like why?  And I knew that guy yesterday and [McGee] I didn't know but I had kind of assuming they were homosexual.  And I said what's wrong, and he said like ...

BY MR. SALARIO:
    Hearsay Your Honor, I object, she's saying what [Lachney] said.

BY THE COURT:
    You can't say what [Lachney] said.

A.    O.K.

28

While the State objected to the hearsay statement and the trial court sustained the objection, Defendant did not lodge an objection to the ruling and give the trial court the opportunity to rule otherwise. Thus, Defendant did not preserve any error for us to review. La.Code Crim.P. art. 841. Further, assuming arguendo that the ruling as to hearsay was error, we find any such error harmless. "The admission of inadmissible hearsay is subject to the harmless error analysis, i.e., whether the verdict was surely unattributable to the error." *State v. Ste. Marie*, 97-168, p. 10 (La.App. 3 Cir. 4/18/01), 801 So.2d 424, 432. In fact, later, during the testimony of Defendant, she stated directly that there was some kind of sexual encounter between Lachney and McGee that made him upset. Thus, what she did not elicit through the hearsay statement from Lachney, she testified to directly. It was also part of her statement to Detective Cammack. Thus, there was no prejudice to Defendant and the verdict rendered was surely not attributable to this point.

## DECREE

For the reasons herein set forth, we affirm the jury verdict conviction of Lisa W. Rabalais for being an accessory after the fact to manslaughter and the sentence imposed.

**AFFIRMED.**